IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-02912-PAB-STV

SARAH COOK,

     Plaintiff,

v.

DON WHYDE,
BRIAN LONG,
CITY AND COUNTY OF DENVER, and
DENVER HEALTH MEDICAL CENTER,

     Defendants.

---

**ORDER**

---

This matter is before the Court on the Amended Motion to Dismiss by Defendant Brian Long [Docket No. 26], Denver Health's Motion to Dismiss [Docket No. 27], City and County of Denver's Motion to Dismiss Claim Four of Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [Docket No. 28], and Defendant's Motion to Dismiss [Docket No. 29] filed by Don Whyde.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. BACKGROUND[1]**

In the early morning of August 3, 2019, defendants Brian Long ("Officer Long") and Don Whyde ("Officer Whyde"), both Denver police officers, responded to a reported

---

[1] The facts below are taken from plaintiff's Second Amended Complaint and Jury Demand, Docket No. 18, and are presumed to be true for purposes of ruling on defendants' motions to dismiss.  *See Brown v. Montoya*, 662 F.3d 1152 (10th Cir. 2011).

burglary and assault at 1800 Larimer Street in Denver, Colorado.  Docket No. 18 at 3,

¶¶ 8–9.  Officer Long was a "recent graduate of the police academy."  *Id.* at 6–7, ¶ 23.

When they arrived at the scene, the suspect had already been transported to St.

Joseph's Hospital for medical evaluation for drug or alcohol abuse.  *Id.* at 3, ¶ 9.  In

both Officer Long's and Officer Whyde's internal affairs investigation responses, they

state that, before arriving at the scene, they reviewed the "call notes" from police

dispatch.  *Id.*, ¶ 10.  These call notes described the suspect as "THIN BLND HAIR PNK

SHIRT BLUE JEANS . . . NO SHOES."  *Id.*  The description in the call notes came from

the victim of the burglary and assault, Richard Billedo ("Billedo"), who was working as a

security guard at the building.  *Id.* at 3–4, ¶ 11.  Mr. Billedo spoke with Officers Long

and Whyde, and their conversation was recorded on the officers' body worn cameras.

*Id.*[2]  Mr. Billedo also informed Officers Long and Whyde that there was video

---

[2] Officer Whyde asks the Court to take judicial notice of the camera footage because plaintiff does not object to its authenticity and the footage is central to plaintiff's complaint.  Docket No. 29 at 3 n.2.  On a motion to dismiss, courts may consider "a document central to the plaintiff's claim and referred to in the complaint . . . where the document's authenticity is not in dispute."  *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005).  However, the Court has "broad discretion in determining whether or not to accept materials beyond the pleadings."  *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998); *see also Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) ("GFF Corp. did not purport to decide whether consideration of materials appended to a motion to dismiss is mandatory or discretionary . . . .  We agree with our sister circuits that if a defendant attaches to a 12(b)(6) motion materials referred to by the plaintiff and central to his claim, the court has discretion to consider such materials.").  And, when a court takes judicial notice of documents, it may do so only to "show their contents, not to prove the truth of the matters asserted therein."  *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); *see also Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (judicial notice of publications may "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true").  The Court will exercise its discretion and decline to take judicial notice of it.  The body camera footage is not central to plaintiff's complaint.  In fact, plaintiff had no access to it at the time the

surveillance of the assault available; however, neither officer viewed or attempted to secure the footage.  *Id.* at 4, ¶ 12.  This failure is documented in the Internal Affairs investigation of both officers and resulted in their suspension.  *Id.* at 4–5, ¶ 14.[3]

On the evening of August 2, 2019, plaintiff, who is "very tall and has black hair," attended a Colorado Rockies game and then went to a bar in the area.  *Id.* at 5–6, ¶¶ 16, 21.  The last thing plaintiff remembers was that she was dancing with friends.  *Id.* at 5, ¶ 16.  At 1:27 a.m. the next morning, approximately 30 minutes before the first report of the burglary, plaintiff was transported by paramedics to Denver Health Medical Center ("Denver Health") to be treated for being drugged and possibly sexually assaulted.  *Id.*, ¶ 17.

As part of the burglary investigation, Officers Long and Whyde responded to Denver Health instead of St. Joseph's Hospital to arrest the suspect in the assault and burglary.  *Id.*, ¶ 18.  When they arrived at Denver Health, they requested that the charge nurse, Angelica Chavez ("Chavez"), identify a female suspect who had been transported from downtown.  *Id.* at 5–6, ¶ 19.[4]  Ms. Chavez identified plaintiff and

---

complaint was filed.  Docket No. 18 at 3–4, ¶ 11.

[3] Officer Whyde asks the Court to take judicial notice of his "Internal Affairs Bureau Statement," Docket No. 29-1, because the complaint expressly cites to the document and plaintiff does not dispute its authenticity.  Docket No. 29 at 3 n.1.  For the reasons discussed with respect to Officer Whyde's request that the Court take judicial notice of the officers' body worn camera footage, the Court exercises its discretion in declining to take judicial notice of the Internal Affairs Bureau Statement.  Facts regarding the Internal Affairs Bureau investigation are best left for summary judgment or trial.

[4] Denver Health procedures require, first, that law enforcement notify hospital security of a patient who will be detained or arrested; second, that security notify the charge nurse, who meets with law enforcement; third, that the charge nurse, security

3

escorted the officers to her hospital bed.  *Id.*  The officers did not ask when plaintiff was

admitted to the hospital or review the call notes that described the suspect and where

the suspect was transported in order to establish that plaintiff was the suspect.  *Id.* at 6,

¶ 22.  Denver Health staff also did not confirm whom the police were looking for.  *Id.*

Nor did the officers confirm with dispatch, emergency medical personnel, or anyone

else which hospital the suspect had been transported to.  *Id.* at 4–5, ¶ 14.  The officers

also did not attempt to re-contact the alleged victim, Mr. Billedo, for a "show-up," which

is a one-on-one identification.  *Id.*; *see also id.* at 6–7, ¶ 23.[5]

　　　Officer Whyde arrested plaintiff, and, while she was handcuffed to her hospital

bed, the officers belittled her by saying, "hope you had a good time," and by making

other degrading comments.  *Id.* at 6, ¶ 26.  At approximately 4:30 a.m. on August 3,

_____

staff, and law enforcement confer about the detainment of the patient before the patient
is arrested.  *Id.* at 6, ¶ 20.  The purpose of this policy is to ensure that multiple people
confirm that the correct person is being arrested; however, these procedures were not
followed.  *Id.*

　　　[5] Plaintiff alleges that Section 104.26 of the Denver Police Operations Manual
("Operations Manual") requires officers to conduct a "show-up."  *Id.* at 6–7, ¶ 23.  The
City asks the Court to take judicial notice of the Operations Manual.  Docket No. 28 at
4.  Plaintiff does not object to the City's request; however, the version of the Operations
Manual that the City provided does not include Section 104.26.  Nevertheless, the Court
will take judicial notice of the Operations Manual, which is available at
https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/Operations
Manual/OMSBook/OM_Book.pdf, because it is an official government publication the
accuracy of which is not subject to reasonable dispute.  *See High Desert Relief, Inc. v.
United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019) ("Though the parties did not
include a copy of this publication on appeal, we may nevertheless take judicial notice of
official government publications."); *see also Utah Gospel Mission*, 425 F.3d at 1253–54.
The Court, however, considers the Operations Manual for its contents, not the truth of
the publication.  *See Tal*, 453 F.3d at 1264 n.24. Section 104.26(2) states that there are
three types of identification procedures: (1) show-ups, which are one-on-one
identifications by a witness or victim, (2) photographic lineups, and (3) physical lineups.

2019, before she was medically stabilized and in violation of Denver Health policy, plaintiff was transported from Denver Health to the Denver County jail. *Id.*, ¶¶ 25, 27.

When plaintiff arrived at the jail, a nurse who examined her noticed severe swelling on her upper lip and recommended that she be sent back to the hospital for evaluation. *Id.* at 8, ¶ 28. Plaintiff was then transported to St. Joseph's Hospital and assessed for a possible allergic reaction. *Id.*, ¶ 29. She was sent back to Denver Health at approximately 7:30 a.m. for examination by a Sexual Assault Nurse Examiner. *Id.*, ¶ 30. At Denver Health, plaintiff reported to an emergency department nurse that she had been charged with a crime that she did not remember being involved in and that she did not remember four or five hours from the previous night. *Id.* After the examination, plaintiff was transported back to the jail and was held for several hours. *Id.*, ¶ 31.

Detective Randy Hinricher ("Detective Hinricher") of the Denver police department was assigned to the case for investigation. *Id.*, ¶ 32. Detective Hinricher viewed the surveillance footage from incident at 1800 Larimer Street, which shows a blonde female forcing her way into the building past the security guard. *Id.*, ¶ 33. In the afternoon of August 4, 2019, plaintiff was released on a personal recognizance bond. *Id.*, ¶ 34. On August 6, 2019, Detective Hinricher spoke to a deputy district attorney and requested that all charges against plaintiff be dropped. *Id.*, ¶ 35.

Plaintiff brings the following claims under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983: (1) unlawful arrest against Officers Long and Whyde; (2) false imprisonment against Officers Long and Whyde; (3) nursing

malpractice/negligence against Denver Health; (4) municipal liability against the City. *Id.* at 10–17, ¶¶ 44–81.  All four defendants filed motions to dismiss.  Docket No. 26 (Officer Long), Docket No. 29 (Officer Whyde), Docket No. 27 (Denver Health), Docket No. 28 (the City and County of Denver (the "City")).  Plaintiff responded to each motion. Docket Nos. 35, 39, 37, 36, respectively.  Defendants replied.  Docket Nos. 42, 45, 41, 43, respectively.

## II.  LEGAL STANDARDS

### A.  Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with his allegations.  *Cory v. Allstate Ins.*, 584 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation

6

omitted)).  Otherwise, the Court need not accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B.  Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A court should resolve questions of qualified immunity at the earliest possible stage of litigation.  *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).  However, a plaintiff facing a qualified

immunity challenge still does not have a heightened pleading standard. *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). Moreover, where "a qualified immunity defense is asserted in a 12(b)(6) motion, . . . [the court applies] a heightened pleading standard, requiring the complaint to contain 'specific, non-conclusory allegations of fact sufficient to allow the district court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of clearly established law.'" *Dill v. City of Edmond*, 155 F.3d 1193, 1204 (10th Cir. 1998) (quoting *Breidenbach v. Bolish*, 126 F.3d 1288, 1293 (10th Cir. 1997)).

8

### III.  ANALYSIS

#### A.  Claim One – Unlawful Arrest – Against Officers Long and Whyde

The Court first considers plaintiff's unlawful arrest claim.  Officers Long and Whyde both argue that they are protected from suit by qualified immunity.  Docket No. 26 at 4; Docket No. 29 at 7.  The officers argue that plaintiff cannot establish that their alleged conduct violated a clearly established constitutional right.  *See* Docket No. 26 at 4–5, 12–15; Docket No. 29 at 7–15.

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case."  *Pearson*, 555 U.S. at 236.  The practical effect of *Pearson*'s directive on the qualified-immunity analysis is that, for a plaintiff to prevail, both prongs must be adequately established; however, for a defendant to prevail, inadequacy with respect to either prong will suffice.  *See Shroff v. Spellman*, 604 F.3d 1179, 1188 (10th Cir. 2010).  The Court first considers whether plaintiff has plausibly alleged a constitutional violation.

##### 1.  *Constitutional Violation*

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  A "seizure" of one's person occurs when a government actor terminates one's freedom of movement through intentional means.  *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007).  The Supreme Court has identified three types of

police encounters with citizens: consensual encounters, investigative stops, and arrests. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc).  Only the latter is relevant to this case, and defendants do not dispute that plaintiff was arrested. An arrest requires probable cause to believe that the arrestee committed a crime. *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008); *Plascencia v. Taylor*, 514 F. App'x 711, 715 (10th Cir. 2013) (unpublished).

"In a qualified immunity context, the probable cause evaluation is a question of law appropriate for resolution by the Court."  *Shimomura v. Carlson*, 17 F. Supp. 3d 1120, 1132 (D. Colo. 2014) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (reversing a holding that the probable cause determination was a question for the trier of fact because "[i]mmunity ordinarily should be decided by the court long before trial")).

In determining whether an officer has probable cause for an arrest, the Court is to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotations marks and citation omitted).  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).  Stated otherwise, "[p]robable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a

reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Cortez*, 478 F.3d at 1116.  Probable cause is not a high bar. *Wesby*, 138 S. Ct. at 586.

"[W]hen a warrantless arrest or seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Cortez*, 478 F.3d at 1120. Thus, in the Tenth Circuit, "[a]s a practical matter, in the context of a qualified immunity defense on an unlawful arrest claim, [courts] ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Corona v. Aguilar*, 959 F.3d 1278, 1285 (10th Cir. 2020) (internal quotation marks and alterations omitted).  "Arguable probable cause" is another way of saying that the officers' conclusions about whether probable cause existed rested on a reasonable but mistaken belief.  *Cortez*, 478 F.3d at 1120.  Therefore, Officers Long and Whyde are entitled to qualified immunity if they "*could* have reasonably believed that probable cause existed in light of well-established law." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) (citation omitted).  "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citation omitted). "[T]he relevant question in a probable cause analysis is whether a 'substantial probability' existed that the suspect committed the crime, requiring something 'more than a bare suspicion.'" *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (citations omitted).

The complaint alleges that Officers Long and Whyde were dispatched to a reported burglary and assault.  Docket No. 18 at 3, ¶ 9.  Before arriving at the scene, the officers reviewed the call notes from dispatch regarding the report.  *Id.*, ¶ 10.  The call notes describe the suspect as "THIN BLND HAIR PNK SHIRT BLUE JEANS . . . NO SHOES."  *Id.*  Dispatch also informed all officers, including Officers Long and Whyde, that the suspect had been transported to St. Joseph's Hospital.  *Id.* at 5, ¶ 15.  Officers Long and Whyde, however, responded to Denver Health, instead of St. Joseph's Hospital.  *Id.*, ¶ 18.  When they arrived at Denver Health, they asked Ms. Chavez, who did not have a description of the suspect, to identify a female who had just been transported from downtown.  *Id.* at 5–6, ¶ 19; *id.* at 11, ¶ 47.  Ms. Chavez led the officers to plaintiff's hospital bed.  *Id.* at 5–6, ¶ 19.  Plaintiff is very tall and has black hair, whereas the suspect was described as short with blonde hair.  *Id.* at 6, ¶ 21.  Moreover, plaintiff was wearing a skirt, whereas the suspect was wearing blue jeans and a pink shirt.  *Id.*  Based on the allegations of the complaint, the Court finds that neither officer could have reasonably believed that probable cause existed in light of well-established law.  The reasonably trustworthy information known to the officers at the time of the arrest would not lead a reasonable officer to believe that plaintiff had committed a crime.  First, despite learning that the suspect had been transported to St. Joseph's Hospital, the officers went to a different hospital.  Based on the allegations of the complaint, a reasonable officer would have no basis to believe that the suspect was located at Denver Health.  That alone defeats any arguable probable cause.  But, second, when the officers were taken to the bed of a woman recently brought to the

12

hospital from downtown Denver, that woman did not match the physical description of the suspect in obvious ways – hair color, height, and clothing.  Once again, that alone defeats any arguable probable cause.[6]

Officer Long argues that there was arguable probable cause for the arrest because he relied on what Mr. Billedo told him and assumed that Officer Whyde would have been able to identify the correct suspect.  Docket No. 26 at 8, 12.  There are no allegations in the complaint, however, regarding what Mr. Billedo may have told the officers.  The complaint states that Mr. Billedo was the source of the description of the suspect, which dispatch relayed to the officers.  Docket No. 18 at 3–4, ¶ 11.  There are also no allegations that Officer Whyde had any additional information that it would have been reasonable for Officer Long to rely upon.  Officer Long also claims that a reasonable officer would have done just what he did and no more and that the law only required that he interview the victim or witnesses at the scene and investigate basic evidence.  Docket No. 26 at 9, 12.  However, the complaint does not contain allegations about what investigative steps Officer Long took besides that he spoke with Mr. Billedo.  *See* Docket No. 18 at 3–4, ¶¶ 11–12.

Similarly, Officer Whyde states that there was arguable probable cause for the arrest.  Docket No. 29 at 9.  Most of Officer Whyde's arguments, however, depend on facts that the Court will not consider at this stage.  *See Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1267 (10th Cir. 2020); *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995)

---

[6] Officer Whyde suggests that the facts will differ from the allegations of the complaint.  However, for purposes of the motions to dismiss, the Court will consider only the well-pled allegations of the complaint.

13

("[I]n determining whether to grant a motion to dismiss, the district court, and consequently this court, are limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint.").  The only arguments that Officer Whyde make that do not depend on facts outside the complaint are that, while plaintiff alleges that Officer Whyde reviewed the call notes, plaintiff does not specifically allege that he reviewed the information about the suspect's physical description.  Docket No. 29 at 9.  Additionally, Officer Whyde states that he relied on Ms. Chavez's identification of a white woman who had been transported from downtown.  *Id.* at 10.  First, there are no allegations in the complaint that Officer Whyde only considered part of the call notes.  To the contrary, plaintiff alleges that Officer Whyde reviewed the notes before arriving at the scene.  Docket No. 18 at 3, ¶ 10.

Officer Whyde's reliance on Ms. Chavez's identification of plaintiff also does not support a finding of arguable probable cause.  Plaintiff alleges that Officer Whyde asked Ms. Chavez to "identify a female suspect that had just been transported from downtown."  *Id.* 6, ¶ 19.  However, according to the complaint, Officer Whyde learned that the suspect had been taken to St. Joseph's Hospital.  Therefore, no reasonable officer could rely on a nurse at the wrong hospital to produce the correct suspect.

Finally, both officers argue that it was reasonable for each of them to rely on the other's investigation.  Docket No. 26 at 13; Docket No. 29 at 10–11.  However, there are no allegations in the complaint that either officer had any additional or different information than the other officer had.  Both of the officers were dispatched and arrived to the scene, reviewed the call notes, learned of the suspect's description, heard that

the suspect was taken to St. Joseph's Hospital, responded to Denver Health, and spoke with Ms. Chavez.  Docket No. 18 at 3–6 ¶¶ 9–14, 18–19.

The Court finds that plaintiff has pled sufficient facts to show that a reasonable officer in Officer Whyde's position would not have found the facts sufficient to establish probable cause, or arguable probable cause, to arrest plaintiff for the burglary and assault at 1800 Larimer Street.  Plaintiff has therefore plausibly established a constitutional violation.  *See Dill*, 155 F.3d at 1204.

### 2. *Clearly Established*

The Court next considers whether the right was clearly established at the time defendants violated it.  "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits."  *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted).  In considering what law is clearly established, factual novelty alone does not automatically provide a state official with the protections of qualified immunity.  *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (noting that in the Fourth Amendment context, "there will almost never be a previously published opinion involving exactly the same circumstances"); *Blake*, 469 F.3d at 914 ("[A] general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." (internal quotation marks and alteration marks omitted)).  The Tenth Circuit has recognized that, "[e]ven when no

15

precedent involves facts 'materially similar' to ours, the right can be clearly established if a precedent applies with 'obvious clarity.'"  *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017).

The clearly established law governing mistaken identity arrests is set out in *Hill v. California*, 401 U.S. 797 (1971).  *See Robinson v. Keita*, 20 F. Supp. 3d 1140, 1153 (D. Colo. 2014), *order amended on reconsideration sub nom. Robinson v. City & Cnty. of Denver*, No. 12-cv-00483-WYD-KMT, 2014 WL 1395758 (D. Colo. Apr. 10, 2014); *see also Jama v. City and Cnty. of Denver*, No. 08-cv-01693-MSK-KLM, 2010 WL 3615027, at *6 (D. Colo. Sept. 9, 2010).  As explained in *Jama*, *Hill* provides that "reasonable mistakes do not constitute constitutional violations" and "demonstrates that an arrest based on similarities in descriptors is reasonable even in the face of some contrary evidence that the individual is the person described in the warrant."  *Jama*, 2010 WL 3615027, at *6.  Thus, "it is clearly established that if police have probable cause to arrest a person, and reasonably mistake someone else for that person, then the arrest of the other person is a valid arrest."  *Robinson*, 20 F. Supp. 3d at 1154.  "It is also 'clearly established that mistaken identity arrests are governed by a "reasonableness" standard – whether the officer's mistake as to the identity was reasonable under the circumstances facing him or her at the time of the arrest.'"  *Id.* (quoting *Jama*, 2010 WL 3615027, at *6); *see id.* (finding it reasonable for officer to arrest plaintiff given that warrant included all of plaintiff's identifying information, including his name, birth date, social security number, height, and weight); *see also Reyes v. Bd. of County Comm'rs*, No. 06-cv-02319-WDM-BNB, 2008 WL 961565, at *4 (D. Colo. April 8, 2008) ("it was

16

reasonable for the ACDF employees to conclude that Plaintiff was the person named in the warrant, as there were numerous matching identifiers"; no Fourth Amendment violation was found as the facially valid warrant gave the officers sufficient probable cause to arrest and detain plaintiff); *Archuleta v. Wagner*, No. 06-cv-02061-LTB-MJW, 2007 WL 646317, at *5–6 (D. Colo. Feb. 27, 2007) (plaintiff's name was same as alias used by wanted fugitive; booking plaintiff after arrest on warrant, despite claims of innocence and mistaken identity, did not give rise to constitutional claim against booking officer, despite officer's subjective belief that plaintiff might not be named in warrant), *aff'd*, 311 F. App'x. 113 (10th Cir. 2009) (unpublished).

The Tenth Circuit has held that the "relevant, dispositive inquiry" for the "clearly established" prong "is whether it would be clear to a reasonable officer that his conduct was unlawful." *Fogarty*, 523 F.3d at 1155 (internal quotations omitted). "In other words, 'the contours of the right' must be 'sufficiently clear that a reasonable official' would understand that what he is doing violates that right." *Romero v. Story*, 672 F.3d 880, 889 (10th Cir. 2012) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1206 (10th Cir. 2010)).

Here, the allegations show that the officers did not make a mistake that was reasonable under the circumstances as in *Jama*, *Reyes*, or *Archuleta*. According to the complaint, the officers knew the suspect was thin with blonde hair, a pink shirt, blue jeans, and no shoes, based on the call notes from dispatch. Docket No. 18 at 3, ¶ 10. The officers also knew that the suspect had been transported to St. Joseph's Hospital. *Id.* at 5, ¶ 15. However, the officers responded to Denver Health and then arrested

plaintiff, who did not match the suspect's description.  *Id.* at 5–7, ¶¶ 18, 21, 25.  Plaintiff has plausibly established that it would have been sufficiently clear to a reasonable officer that there was no probable cause to arrest her.

Because "a government official must have probable cause to arrest an individual," *Fogarty*, 523 F.3d at 1158–59 (citation omitted), and a reasonable officer in Officer Whyde's position would have known that there was no probable cause, or even arguable probable cause, to arrest plaintiff, the Court finds that plaintiff has shown that the constitutional violation was well-settled and that Officer Whyde is not entitled to qualified immunity on the false arrest claim.  *See id.* at 1159 ("well-settled constitutional . . . precedent would have put reasonable officers on notice that they lacked probable cause to effectuate an arrest").

### 3.  Personal Participation

The Court next considers whether Officer Long may be liable as an "indirect participant" given that plaintiff does not allege that he was the arresting officer.  Instead, plaintiff claims that, although Officer Long was not the arresting officer, he "set in motion a series of events that he knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."  Docket No. 18 at 12, ¶ 54 (quoting *Buck v. City of Albuquerque*, 549 F.3d 1269, 1280 (10th Cir. 2008)).  As such, plaintiff insists that Officer Long was an "integral participant" in the violation under 42 U.S.C. § 1983.  *Id.*

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."  *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.

18

1997).  "Personal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him."  *Fogarty*, 523 F.3d at 1162.  Therefore, "[f]or liability under section 1983, direct participation is not necessary."  *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990).  "Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable.  The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."  *Id.*  "Concerning a defendant acting in a non-supervisory capacity, there must be cause in fact between the conduct complained of and the constitutional deprivation."  *Id.* (citing *Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir. 1989)).

Officer Long argues that plaintiff's "integral participant" theory fails because the case that she relies on, *Buck*, is distinguishable.  Docket No. 26 at 6–7.  *Buck* involved a police captain who directly supervised his officers' conduct, issued directives, and was the "catalyst of the chain of events."  *Buck*, 549 F.3d at 1280.  Officer Long argues that he could not have had such a role in plaintiff's arrest because, unlike the captain in *Buck*, plaintiff alleges that Officer Long was a "recent graduate of the police academy" and "barely a commissioned officer."  Docket No. 26 at 7–8 (quoting Docket No. 18 at 6–7, ¶ 23).

While the Court agrees that *Buck* is not factually identical to the this case, Officer Long overstates its holding and is mistaken that only direct participants or supervisors may be liable for constitutional violations under analogous circumstances.  *Buck*, relying

on *Snell*, explained that "direct participation is not necessary. Any official who 'causes'

a citizen to be deprived of her constitutional rights can also be held liable." *Buck*, 549

F.3d at 1279 (citing *Snell*, 920 F.2d at 700). "Such responsibility includes 'set[ting] in

motion a series of events that the defendant knew or reasonably should have known

would cause others to deprive the plaintiff of his constitutional rights." *Metzler v. City of*

*Colo. Springs*, 841 F. App'x 94, 99 (10th Cir. 2021) (unpublished) (quoting *Buck*, 549

F.3d at 1279–80). Liability may also extend beyond officers who set in motion

constitutional violations, as the Tenth Circuit has held that all "officers nevertheless

have a duty not to cause constitutional violations," *Webb v. Thompson*, 643 F. App'x

718, 723 (10th Cir. 2016) (unpublished), and "[a]ny official who causes a citizen to be

deprived of her constitutional rights can . . . be held liable." *Id.* (quoting *Buck*, 549 F.3d

at 1279). Moreover, the indirect participation principle has been applied in scenarios

involving non-supervisory officers who did not directly participate in the offensive

conduct. *See, e.g.*, *McAllister v. Kellogg*, No. 13-cv-2896-CMA-MJW, 2015 WL

2329425, at *8 (D. Colo. May 14, 2015) (finding sufficient causal participation with non-

supervisory officer who prepared warrant affidavit for arrest but did not conduct the

arrest), *aff'd*, 637 F. App'x 518 (10th Cir. 2016) (unpublished); *Holland v. Krogstad*,

2012 WL 13076246, at *8 n.4 (D.N.M. Aug. 23, 2012) (applying *Buck* in non-

supervisory officers' failure to intervene); *Harper v. Rose*, 2012 WL 1150463, at *6 (D.

Utah Apr. 5, 2012) (applying *Buck* in excessive force claim against non-supervisory

officer and even though defendant did not actually tase the plaintiff). Thus, Officer

Long is not insulated from liability just because he did not effectuate plaintiff's arrest.

However, the Court finds that plaintiff fails to plausibly allege that Officer Long set in motion a series of events that he knew or should have known would deprive plaintiff of her constitutional rights.  *See Metzler*, 841 F. App'x at 99.  The allegations show that both Officer Long and Officer Whyde reviewed the call notes that contained a description of the suspect based on Mr. Billedo's complaint, heard a dispatch that the suspect was taken to St. Joseph's Hospital, went to Denver Health instead of St. Joseph's, and saw plaintiff, who did not match the victim's description.  Docket No. 18 at 3–6 ¶¶ 9–14, 18–19.  There are no facts indicating that Officer Long had any unique information that Officer Whyde did not have or that Officer Whyde relied on Officer Long for information[7] that Officer Long knew or should have known would result in plaintiff's arrest.  *See Wulf*, 883 F.2d at 864 (citing *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988) ("The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights.")).  The Court therefore finds that Officer Long was not an integral participant in plaintiff's false arrest.

Officer Whyde argues that he was not the arresting officer, but rather "merely placed a hold on Plaintiff" until Officer Long arrived.  Docket No. 29 at 13, ¶ 45.  Plaintiff's allegations, which are assumed to be true, indicate otherwise.  Docket No. 18 at 7, ¶ 25.  Thus, the Court will dismiss the false arrest claim against Officer Long, but not against Officer Whyde.

---

[7] Plaintiff alleges that Officer Whyde relied on Officer Long's investigation, *see, e.g.*, *id.* at 6, ¶ 23; however, plaintiff does not specify what Officer Whyde learned from Officer Long that Officer Whyde did not already know.

21

**B.  Claim Two – False Imprisonment – Officers Long and Whyde**

The Court next considers plaintiff's false imprisonment claim, which is brought under 42 U.S.C. § 1983.  Docket No. 18 at 13, ¶ 57.  Plaintiff alleges that Officers Long and Whyde "purposely and deliberately restricted [her] freedom of movement when they arrested her and handcuffed her to a hospital bed."  *Id.*, ¶ 58.  Plaintiff alleges that her "freedom of movement was further restricted when she was detained in the Denver County jail" for nearly two days and that she was aware that her freedom of movement was restricted.  *Id.* at 13–14, ¶¶ 58–60.

As with plaintiff's false arrest claim, the Court must consider Officer Long's and Whyde's arguments that they are protected from suit by qualified immunity.  *See* Docket Nos. 26 at 4, 29 at 7.  The Court first considers whether plaintiff has plausibly alleged a constitutional violation and then whether the right was clearly established.  *Pearson*, 555 U.S. at 236; *Shroff*, 604 F.3d at 1188.

As the Tenth Circuit has explained, "two claims arise from an allegedly unconstitutional imprisonment as analysis 'shifts' from the Fourth Amendment to the Due Process Clause." *Mondragón v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008) (citation omitted).  The "shift" occurs with the institution of legal process – that is, with the inception of the process meant to justify the imprisonment.  *Id.*  Claims regarding an individual's treatment during "the period of time between an unlawful arrest and the institution of legal process forms one constitutional claim, arising under the Fourth Amendment."  *Id.*  Claims regarding an individual's treatment after the institution of process and prior to the favorable termination of that process – through acquittal,

22

habeas corpus, voluntary dismissal, and so on – forms a second claim, this one arising under the Due Process Clause. *Id.*

"[C]ourts have used the common law of torts as a 'starting point' for determining the contours of claims of constitutional violations under § 1983." *Pierce v. Gilchrist*, 359 F.3d 1279, 1286 (10th Cir. 2004) (citing *Carey v. Piphus*, 435 U.S. 247, 257–58 (1978)). The common law tort of false imprisonment has three elements: (1) intentional restriction of freedom of movement (2) for a period of time, either directly or indirectly, by defendant, and (3) the plaintiff's awareness of the restriction. *Bark v. United States*, No. 10-cv-01558-LTB-MEH, 2012 WL 364075, at *2 (D. Colo. Feb. 1, 2012) (citing Colorado Model Jury Instructions 21:1). Additionally, a claim for false imprisonment fails if the defendant had probable cause to believe that the plaintiff committed a criminal offense. *Rose v. City & Cnty. of Denver*, 990 P.2d 1120, 1123 (Colo. App. 1999). Torts, however, "are only analogies because § 1983 suits ultimately rest on the Constitution, not on state (or federal) common law." *Mondragón*, 519 F.3d at 1082 (citing *Pierce*, 359 F.3d at 1285–88 (explaining that the argument that a plaintiff must prove each element of the common law tort to prevail on a § 1983 claim "would make the common law tort not a 'starting point' for analysis but the final word")). "Although the common law tort serves as an important guidepost for defining the constitutional cause of action, the ultimate question is always whether the plaintiff has alleged a constitutional violation." *Pierce*, 359 F.3d at 1289 (quoting *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996)).

In cases like plaintiff's, the Tenth Circuit has held, "[i]f arrested without a warrant

– and thus triggering 'the Fourth Amendment require[ment of] a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest,' . . . – a plaintiff can challenge the probable cause determination made during the constitutionally-required probable cause hearing." *Wilkins v. DeReyes*, 528 F.3d 790 798–99 (10th Cir. 2008) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)).

Plaintiff alleges that Officers Long and Whyde "purposely and deliberately restricted [her] freedom of movement when they arrested her and handcuffed her to a hospital bed." Docket No. 18 at 13, ¶ 58. Plaintiff claims that she was arrested in the early hours of August 3, 2019, that she was released on a personal recognizance bond in the afternoon of August 4, 2019, and that the charges against her were dropped on August 6, 2019. *Id.* at 7–8, ¶¶ 25–27, 34–35. The relevant time period for plaintiff's false arrest claim is between her arrest and when she was released on bond. *Id.* at 13, ¶ 59. The Court therefore considers plaintiff's claim as "analogous to a tort claim for . . . false imprisonment" because she challenges the time that she was held "without legal process . . . under the Fourth Amendment." *See Mondragón*, 519 F.3d at 1082; *see also* Docket No. 18 at 13, ¶ 57.

The Tenth Circuit has held that it is not appropriate to "confine constitutional claims to the precise rubric of tort law" and has rejected the view that a "plaintiff does not state a claim actionable under § 1983 unless [s]he satisfies the requirements of an analogous common law tort." *Pierce*, 359 at 1290. Even still, the Court finds that plaintiff has plausibly alleged the elements of the common law tort of false imprisonment. Her freedom was intentionally restricted from when she was arrested on

24

August 3 until she was released on August 4, and she was aware of this restriction.

Torts, however, are only analogies to constitutional violations. *See id.* "[A] plaintiff states a claim for false imprisonment in violation of § 1983 by specifically alleging facts that show a government official acted with deliberate or reckless intent to falsely imprison the plaintiff." *Romero*, 45 F.3d at 1480. "[U]nder state common law . . . the slightest interference with personal liberty is a false imprisonment.  It does not follow that all such invasions however trivial or frivolous serve to activate remedies" under the United States Constitution. *Wells v. Ward*, 470 F.2d 1185, 1187 (10th Cir. 1972).

"An act is reckless when it reflects a wanton or obdurate disregard or complete indifference to risk, for example 'when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death' or grievous bodily injury." *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992). "[R]eckless intent does not require that the actor intended to harm a particular individual; reckless intent is established if the actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." *Id.*

In her complaint, plaintiff states that Officers Long and Whyde "purposely and deliberately restricted [her] freedom of movement when they arrested her and handcuffed her to a hospital bed." Docket No. 18 at 13, ¶ 58.  She also states that the officers "acted with deliberate or reckless intent when they either failed to access information available to them from the eyewitness, dispatch notes, from radio communications with dispatch, from a show-up or photograph procedure" or ignored

25

this information.  *Id.* at 14, ¶ 61.

The Court finds that plaintiff has not plausibly alleged that the officers acted recklessly in arresting plaintiff without probable cause or not conducting a more substantial investigation.  Although Officer Whyde arrested plaintiff without probable cause and could have done more to verify whether plaintiff was the suspect of the burglary, a police officer does not commit false imprisonment merely by arresting someone who happens to be innocent because the Constitution does not "guarantee that only the guilty will be arrested."  *See Baker v. McCollan*, 443 U.S. 137, 145–46 (1979); *see also Romero*, 45 F.3d at 1480 (citing *Edwards v. Baer*, 863 F.2d 606, 607 (8th Cir. 1988) ("The mere fact that an invalid arrest takes place does not ordinarily convert the common law tort of false arrest or false imprisonment to a violation of a constitutional right.")).  Thus, mistakes in investigations cannot, without more, result in constitutional violations.

Plaintiff's arguments to the contrary are unpersuasive.  She argues that Officer Whyde would have been aware of the obvious risk that failing to establish probable cause before an arrest could likely result in the serious harm of false imprisonment yet proceeded despite this unreasonable risk and in reckless disregard of the consequences.  Docket No. 18 at 14, ¶ 61.  However, this generalized risk exists in every arrest, and recklessness requires more egregious conduct.  *See, e.g.*, *Webber v. Mefford*, 43 F.3d 1340, 1343 (10th Cir. 1994) ("[A] government official violates an individual's [constitutional] rights by injuring his or her life, liberty, or property interest with deliberate or reckless intent."); *Robinson v. Maruffi*, 895 F.2d 649, 657 (10th Cir. 1990) (district court properly instructed jury that plaintiff could recover under § 1983 for

26

false imprisonment where police officers deliberately obtained false testimony from prosecution witnesses in attempt to convict plaintiff); *Rex v. Teeples*, 753 F.2d 840, 842–43 (10th Cir. 1985) (plaintiff stated claim for a § 1983 violation by alleging that police officer deliberately conspired with physician to have mental hold placed on plaintiff in order to improperly detain and question plaintiff in criminal investigation).

The complaint alleges that Officers Long and Whyde were dispatched to a reported burglary and assault and reviewed the call notes from dispatch regarding the report before arriving on the scene.  Docket No. 18 at 3, ¶¶ 9–10.  The call notes describe the suspect as "THIN BLND HAIR PNK SHIRT BLUE JEANS . . . NO SHOES," *id.*, and dispatch informed the officers that the suspect had been transported to St. Joseph's Hospital.  *Id.* at 5, ¶ 15.  Officers Long and Whyde responded to Denver Health instead.  *Id.*, ¶ 18.  When they arrived at Denver Health, plaintiff alleges that they asked Ms. Chavez, who had not been given a description of the suspect, to identify a female who had just been transported from downtown.  *Id.* at 5–6, ¶ 19; *id.* at 11, ¶ 47.  Ms. Chavez led the officers to plaintiff's hospital bed.  *Id.* at 5–6, ¶ 19.  Plaintiff, however, does not match the description of the suspect.  *Id.* at 6, ¶ 21.

While these allegations are sufficient to plausibly establish that the officers lacked probable cause to arrest plaintiff for the burglary and assault, the Court finds that the allegations do not establish deliberate or reckless intent to falsely imprison plaintiff. As explained, "[a]n act is reckless when it reflects a wanton or obdurate disregard or complete indifference to risk."  *Medina*, 960 F.2d at 1496.  For instance, an actor is reckless with respect to another person when the actor "does not care whether the other person lives or dies, despite knowing that there is a significant risk of death or

grievous bodily injury." *Id.* (citation omitted).  Negligence, or even gross negligence, is not enough to maintain a § 1983 false imprisonment claim.  *See, e.g.*, *Dodds*, 614 F.3d at 1204–05 (citing *Webber*, 43 F.3d at 1342 ("[A] government official violates an individual's Fourteenth Amendment rights by injuring his or her life, liberty, or property with deliberate or reckless intent.")).  The Court therefore finds that plaintiff has failed to plausibly allege a § 1983 false imprisonment claim.  Because plaintiff has not established a constitutional violation, the Court need not consider the clearly-established prong of the qualified immunity analysis, *see Pearson*, 555 U.S. at 236; *Shroff*, 604 F.3d at 1188, and the Court does not reach the officers' integral participant arguments.

### C.  Claim Three – Nursing Malpractice/Negligence – Denver Health

The Court next turns to Denver Health's motion to dismiss plaintiff's nursing malpractice/negligence claim.  Docket No. 27.  While plaintiff titles her claim "nursing malpractice/negligence," she recites only the elements of a "professional negligence" claim.  *See* Docket No. 18 at 14–16, ¶¶ 63–70.  The Court therefore considers plaintiff's claim against Denver Health to sound in negligence, not malpractice.  "To recover on a claim of professional negligence, the plaintiff must prove that the professional owed a duty of care to the plaintiff, that the professional breached the duty of care, that the breach proximately caused an injury to the plaintiff, and that damages resulted. *Gibbons v. Ludlow*, 304 P.3d 239, 244 (Colo. 2013) (citing *United Blood Servs. v. Quintana*, 827 P.2d 509, 519 (Colo. 1992)).  The initial question in any negligence action is whether the defendant owed a duty to protect the plaintiff against injury. *HealthONE v. Rodriguez ex rel. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002).  This is a

28

question of law to be determined by the Court. *Smith v. City & Cnty. of Denver*, 726 P.2d 1125, 1127 (Colo. 1986); *see also Metro. Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 317 (Colo. 1980) ("The court determines, as a matter of law, the existence and scope of the duty that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection."). "A negligence claim will fail if it is predicated on circumstances for which the law imposes no duty of care upon the defendant." *HealthONE*, 50 P.3d at 888 (citing *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320 (Colo. 1992)).

Plaintiff alleges that, because Ms. Chavez was acting within the course and scope of her employment, Denver Health is liable to plaintiff under principles of *respondeat superior*, as Ms. Chavez breached the duty of care "to prevent loss or injury to Plaintiff, including by protecting her from unlawful arrest and false imprisonment." Docket No. 18 at 14–15, ¶¶ 64, 66. This occurred, plaintiff alleges, when Ms. Chavez led Officers Long and Whyde to plaintiff's hospital bed and allowed the officers to arrest plaintiff without sufficient identifying information. *Id.* at 15, ¶ 67. Plaintiff states that this, along with Ms. Chavez's failure to follow Denver Health policies and procedures regarding the release of patients who are detained or arrested, constituted a breach of Denver Health's duty of care. *Id.*, ¶¶ 68–69.

Denver Health moves to dismiss plaintiff's claim because Ms. Chavez had no authority or duty to interfere with the officers or disobey the officers' request that she take them to the female who had just been transported from downtown. Docket No. 27 at 5–6. Additionally, Denver Health explains that plaintiff alleges that Ms. Chavez was not provided any information about the suspect or the crime, which she could have

29

used to verify that the officers had the right person.  *Id.* at 6.

The Court agrees with Denver Health.  While plaintiff is correct that nurses are held to the standard of care of a reasonable nurse and that nursing is a highly regulated profession, Docket No. 37 at 5, plaintiff has not provided any authority that the standard of care of a reasonable nurse requires the nurse to confirm that police officers who arrive at a hospital to arrest a suspect have probable cause to do so or have confirmed that the person to be arrested is the suspect the officers are looking for.  Plaintiff relies on *Wood v. Rowland*, 592 P.2d 1332, 1335 (Colo. App. 1978), but that case does not support plaintiff's argument that a reasonable nurse in Ms. Chavez's position was required to intercede in the officers' search for the suspect.  In *Wood*, the court considered the following instances of a nurse's negligence: failing to report to the doctor a patient's history of a heart condition and medication, failing to report vomiting by a patient, not taking a patient's vital signs, and performing inadequate testing in the emergency room.  *Id.*  None of these failures, however, is relevant to the allegations in the complaint, and none establishes that Ms. Chavez should have confirmed that the officers had enough information to identify the suspect before they made a warrantless arrest.  Plaintiff has not otherwise established that a reasonable nurse would have a duty to do so.  *See Tracz ex rel. Tracz v. Charter Centennial Peaks Behavioral Health Sys.*, 9 P.3d 1168, 1173 (Colo. App. 2000) ("To prevail on a claim of professional negligence against a physician or other trained medical professional, a plaintiff must establish that the professional failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by that defendant.").

30

Plaintiff has also not provided any authority for her argument that a hospital's policies can create a professional duty such that failure to follow those policies would amount to negligence.  In fact, the opposite may be true.  *See Wood*, 592 P.2d at 1335 ("What a hospital may require of its nurses has little, if anything, to do with the obligations that specialized training and experience may impose on nurses in the community."); *Tracz*, 9 P.3d at 1173 (explaining that the standard of care based on ordinary members of the same profession).  Thus, even if Ms. Chavez had violated Denver Health policy, such a violation is not sufficient to prove plaintiff's claim of professional negligence.  The Court will therefore grant Denver Health's motion to dismiss plaintiff's third claim for relief.

Because the Court finds that Denver Health owed no duty to plaintiff to verify that the officers had probable cause to arrest and properly identified the suspect, the Court need not address Denver Health's alternative argument on foreseeability, *see* Docket No. 27 at 7, or plaintiff's *respondeat superior* argument.  Docket No. 18 at 14, ¶ 64.  Additionally, in her response brief, plaintiff sets forth a new argument that Denver Health provided substandard care to her as evidenced by the fact that she had to be taken to St. Joseph's Hospital for additional treatment after her arrest and discharge from Denver Health.  Docket No. 37 at 6.  This argument, however, is not found in plaintiff's complaint, which appears to link her post-arrest visit to St. Joseph's Hospital to the fact that she was arrested and discharged before medically stabilized, not because Denver Health provided inadequate care.  *See* Docket No. 18 at 7, ¶ 25.  The Court will not entertain a new argument made for the first time in a response brief because a motion to dismiss weighs the sufficiency of allegations in a complaint.  *See*

*Khalik*, 671 F.3d at 1190; *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1566 (10th Cir. 1993) (in reviewing an order granting a motion to dismiss, a court "confin[es] [its] review to the allegations of the complaint").[8]

### D.  Claim Four – Municipal Liability – City of Denver

Lastly, the Court considers plaintiff's municipal liability claim, Docket No. 18 at 16–17, ¶¶ 71–81, and the City's motion to dismiss.  Docket No. 28.  Local governments may not be sued under 42 U.S.C. § 1983 on a theory of *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978).  Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 690 (footnote omitted).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal

---

[8] Plaintiff asks the Court to award her attorney's fees for having to respond to Denver Health's motion because, she argues, the motion is frivolous.  Docket No. 37 at 8–10.  The Court will not consider this request.  First, the Local Rules require that "[a] motion shall be filed as a separate document."  D.C.COLO.LCivR 7.1(d).  Second, the fact that the Court is granting Denver Health's motion contradicts plaintiff's theory that it is frivolous.

policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Plaintiff argues that the second and fifth forms of municipal liability, a custom

amounting to a widespread practice and a failure to train police officers, apply here.

The plaintiff must further show that "the policy was enacted or maintained with

deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of*

*Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). "The deliberate

indifference standard may be satisfied when the municipality has actual or constructive

notice that its action or failure to act is substantially certain to result in a constitutional

violation, and it consciously or deliberately chooses to disregard the risk of harm."

*Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted). Thus, in

order to state a claim under § 1983 for deliberate indifference based on a policy or

practice, plaintiff must allege "(1) official policy or custom, (2) causation, and (3) state of

mind." *Schneider*, 717 F.3d at 769.

Because the Court has previously found that plaintiff states a claim against

Officer Whyde for committing a constitutional violation in arresting plaintiff without

probable cause, the Court finds that the first element of the municipal liability claim, a

municipal employee committing a constitutional violation, has been met.  *See Jiron*, 392 F.3d at 419.  The Court therefore considers whether the City had a (1) policy or custom amounting to a widespread practice or (2) a failure to train employees.  *See Bryson*, 627 F.3d at 788.  For each of these theories, the Court must also consider whether plaintiff has plausibly alleged causation and deliberate indifference.  *See Schneider*, 717 F.3d at 769.

### 1.  *Custom Amounting to Widespread Practice*

Plaintiff argues that publicly available information confirms that more than 500 people were "wrongly imprisoned" in Denver over seven years before authorities realized that they had arrested the wrong person.  Docket No. 18 at 16, ¶ 76.  She explains that the information reflects that these 500 "mistaken identity arrests" occurred between 2002 and 2009.  *Id.* at 9, ¶ 38.  Although she acknowledges that she needs to show similar instances of misconduct, Docket No. 36 at 9, plaintiff provides no allegations that any of these 500 arrests, which were all at least ten years before plaintiff's arrest, involved sufficiently similar circumstances to plaintiff's.  Most crucially, plaintiff does not allege that any of the arrests were warrantless or that any of the officers lacked probable cause.  If the police officers in the cases that plaintiff relies upon had probable cause – or even arguable probable cause – but simply mistook the arrestee for the suspect, those cases could not provide a pattern of constitutional violations because such arrests would have been constitutional.  Moreover, even if the 500 mistaken identity arrests were all factually similar to plaintiff's arrest, plaintiff provides no factual support for her proposition that the unconstitutional practice has continued for the last ten years.  Plaintiff instead simply states that it has.  She claims

34

that the "systemic problem continued without correction into, at least, 2014 based on public reports."  Docket No. 18 at 9, ¶ 38.  She alleges that "the policy [also] continued uninterrupted into 2019, as demonstrated by Plaintiff's unlawful arrest."  *Id.*  Plaintiff, however, provides no support for either of these conclusory allegations in the complaint.  She does not allege any supporting facts that could establish how many mistaken identity arrests occurred during this time period, let alone whether the arrests were warrantless or lacking in probable cause like plaintiff's.  Furthermore, even assuming that plaintiff's conclusory allegations are true with respect to the 500 arrests between 2002 and 2009 and the supposed continuation until 2014, plaintiff only cites one instance of a mistaken identity arrest after 2014, her own.  A single incident is not sufficient to show a widespread policy unless the "particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued."  *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009) (citing *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)).  Plaintiff provides no allegations that her arrest was pursuant to an authority figure's policy decision.  The Court thus finds that the plaintiff has not "demonstrate[d] a *specific* pattern or series of incidents that support the general allegation of a custom or policy."  *Sekerak v. City & Cnty. of Denver*, 1 F. Supp. 2d 1191, 1199 (D. Colo. 1998) (quoting *Henry v. Farmer State Bank*, 808 F.2d 1228, 1237 (7th Cir. 1986) (emphasis added)).

Because the Court finds that plaintiff has not plausibly alleged an official policy or a custom in the form of a widespread practice, the Court need not consider whether plaintiff has plausibly established that the widespread practice caused her unconstitutional arrest or that the City acted with deliberate indifference to the practice.

*See Schneider*, 717 F.3d at 769.

### 2. *Failure to Train*

To state a *Monell* claim based on the failure to train or supervise, "a plaintiff must sufficiently allege that the failure 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Rehberg v. City of Pueblo*, No. 10-cv-00261-LTB-KLM, 2012 WL 1326575, at *4 (D. Colo. Apr. 17, 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S. 808, 822–823, (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

"Deliberate indifference" is an exacting standard of fault. *See Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). It requires showing that a municipal actor disregarded a known or obvious consequence of his action. *Id.* "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61. "Deliberate indifference" for purposes of failure to train or supervise ordinarily necessitates a showing of a pattern of similar constitutional violations by untrained employees. *See Bryan Cnty.*, 520 U.S. at 409. Therefore, to proceed on a failure-to-train theory, plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of

36

constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Jenkins*, 81 F.3d at 994 (quoting *Canton*, 489 U.S. at 390).  Notice of particular deficiencies in a training program is the crux of a failure-to-train theory because, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 61.

Plaintiff alleges that the City has "improper, inadequate and unconstitutional" training in arrest procedures for officers.  Docket No. 18 at 16–17, ¶¶ 74–75, 79.  In particular, plaintiff states that officers must be trained that when there is "uncertainty that the correct suspect is being arrested or detained, the alleged victim or witness should be physically present to make a positive identification." *Id.* at 16, ¶ 75.  The deficient training is made evident, plaintiff alleges, by the more than 500 incidents of mistaken identity arrests between 2002 and 2009 and by plaintiff's arrest. *Id.* at 9, ¶ 38; *id.* at 16, ¶ 76.  Plaintiff also alleges that, despite this history of false arrests, the City has not made any significant changes to its "policies, to disciplinary practices, or training policies" to prevent ongoing violations. *Id.* at 17, ¶ 78.  Therefore, plaintiff claims, the City's training programs are not up-to-date, and the City is not properly instructing officers on the correct arrest procedures. *Id.*, ¶ 77.  Rather, plaintiff argues, the training received by Officers Long and Whyde was "improper, inadequate, and unconstitutional," which "evidences a deliberate indifference to the citizens of the State of Colorado by [the City] because it is axiomatic that poorly trained police officers will violate a citizen's constitutional rights." *Id.*, ¶ 79.

37

Missing from these allegations, however, are any supporting factual allegations providing a basis for plaintiff's failure-to-train theory.  Plaintiff does not set forth any facts concerning how the individual defendants were trained, who they were trained by, why their training was deficient, or what the City's training includes and how it has changed since the alleged pattern began in 2002.  *See Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing municipal liability claim where plaintiff had "generally allege[d]" that the individual defendants were not properly trained but had not "allege[d] specific deficiencies in training and supervision, or explain how the incident described in the Amended Complaint could have been avoided with different or better training and supervision"); *see also Rehberg*, 2012 WL 1326575, at *5 (dismissing *Monell* claim where plaintiff had failed to allege specific facts regarding the officers' training and did not identify individuals that allegedly failed to adequately supervise or train).  This alone is fatal to plaintiff's failure-to-train claim.  *See Connick*, 563 U.S. at 61 (notice of particular deficiencies in a training program is the crux of a failure-to-train theory).

Instead, plaintiff contends that Denver's current police policies and procedures require in-person identification by a victim, Docket No. 18 at 6–7, 9, ¶¶ 23–24, 37, but insists that Officers Long and Whyde did not follow these policies as evidenced by plaintiff's unconstitutional arrest.  Plaintiff, however, is mistaken.  The Operations Manual does not require in-person identification.  *See* Operations Manual, Section 104.26.  Instead, it states that, to "ensure accuracy, officers and investigators will use the following procedures, under the proper circumstances, when identifying possible suspects involved in a crime under investigation."  *Id.*  The procedures list three kinds of

identifications, namely, show-ups, photographic lineups, and physical lineups.  *Id.*  The Operations Manual does not require officers to follow one particular procedure. Moreover, even if in-person identification were required, two officers' failure to follow a police department's constitutionally sufficient policies does not establish that the City has failed to adequately train officers.  *See Connick*, 563 U.S. at 62 (explaining necessity of alleging a pattern of similar constitutional violations in failure to train context).  Nor is plaintiff's reliance on the 500 incidents of mistaken identify arrests from 2002 to 2009 sufficient.  As discussed above, plaintiff has not provided any supporting allegations that the 500 arrests involved similar constitutional violations as plaintiff's – or even constitutional violations of any kind.  *See Est. of Lobato by & through Montoya v. Correct Care Sols.*, LLC, No. 15-cv-02718-PAB-STV, 2017 WL 1197295, at *8 (D. Colo. Mar. 31, 2017) (citing Coffey v. United States, 2011 WL 6013611, at *33 (D.N.M. Nov. 28, 2011) (noting that "the incidents [supporting a failure-to-train claim] must also be sufficiently similar to put officials on notice of the situation")).

As with the widespread practice theory, because the Court has found that plaintiff did not plausibly allege a pattern of similar constitutional violations, *see Connick*, 563 U.S. at 62, the Court need not consider whether plaintiff plausibly alleged that the City's failure to train Denver police officers to verify arrestees' identities caused her unconstitutional arrest or that Denver acted with deliberate indifference to the alleged failure to train.  *See Schneider*, 717 F.3d at 769.  The Court will therefore grant the City's motion to dismiss plaintiff's municipal liability claim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Amended Motion to Dismiss by Defendant Brian Long [Docket No. 26] is **GRANTED**.  It is further

**ORDERED** that all claims against defendant Brian Long are **DISMISSED with prejudice**.  It is further

**ORDERED** that Defendant's Motion to Dismiss [Docket No. 29] filed by Don Whyde is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that plaintiff's false imprisonment claim against defendant Don Whyde is **DISMISSED with prejudice**.  It is further

**ORDERED** that Denver Health's Motion to Dismiss [Docket No. 27] is **GRANTED**.  It is further

**ORDERED** that plaintiff's third claim for relief against defendant Denver Health Medical Center is **DISMISSED with prejudice**.  It is further

**ORDERED** that City and County of Denver's Motion to Dismiss Claim Four of Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [Docket No. 28] is **GRANTED**.  It is further

**ORDERED** that plaintiff's fourth claim for relief against the City and County of Denver is **DISMISSED with prejudice**.

DATED September 29, 2021.


BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge